LINCOLN SAVINGS BANK *v.* T. J. GRAY & CO., *et al.*

1. RESULTING TRUST. *Statement of case.* G as G & Co., obtained advancements from bank with agreement to purchase and ship grain, and turn over the bills of lading to cover the money advanced, and bought grain with money so obtained, and shipped and sold it without turning over the bills of lading, and formed a new company with W and others as partners, under the style of G & Co., using the proceeds of sales of the grain so purchased as capital stock in the new firm. *Held,* the bank had no lien or equity on the grain so purchased which it could enforce, and could not follow the *fund* as a trust fund in the new firm, and that its only remedy was to proceed against G as an ordinary debtor, and attach or levy on his interest in the new firm.

2. PARTNERSHIP. A creditor of an individual partner is not entitled to wind up the firm to subject his interest in same, without first fixing a lien by process.

3. CHANCERY PRACTICE. *Attachment.* But the complainant having obtained an attachment against the property of the firm, and impounded its effects, and the firm having submitted to it and replevied the property, and the chancellor having ordered an account of the interest of the indebted partner in the firm, which was taken, the court decreed the rights and equities of the parties under such account.

---

FROM LINCOLN.

---

Appeal from the Chancery Court at Fayetteville. J. W. BURTON, Ch.

HOLMAN & HOLMAN for complainant.

LAMB & TILLMAN and WOODARD & WOODARD for defendants.

FREEMAN, J., delivered the opinion of the court.

This case has been elaborately and earnestly argued by counsel on both sides. In order to see the real issues between the parties, we find it necessary to give

a somewhat extended statement of the allegations of complainant's bill.

The facts as charged are substantially as follows: That previous to July, 1876, T. J. Gray, under the style of T. J. Gray & Co., had been doing business in the town of Fayetteville, as a grain merchant, purchasing wheat and corn, perhaps other produce, to be shipped South for sale. That complainant had furnished money for such purchase, under the following agreement, to-wit, that said Gray should ship the grain purchased and turn over immediately the bills of lading to the bank to cover the money advanced him with which to purchase the produce. He seems to have gone on satisfactorily for perhaps a considerable time under this arrangement, but in time he had begun to ask, and had been allowed to delay shipment immediately, and was allowed by the bank to hold his produce, on the plea of hope of better prices, or the excuse that cars could not be procured in which to ship, or for time to find purchasers; and for these reasons, in the year 1876, it is said he was not required to turn over the bills of lading daily. So it was, it is charged, that in this way he got large advances by checks, and has failed to turn over bills of lading as he had agreed to do—has shipped the grain South—sold it and failed to pay over the money or discharge his debt to the bank.

It is further charged, that Gray had shipped grain to South Carolina and Georgia in May and June, 1876, on which he expected to realize a profit, had sold it and failed to pay it on complainant's debt.

It is then charged, that in July, 1876, the complainant having refused to make further advances, a new firm was formed, composed of T. J. Gray, R. S. Woodard, and two sons of T. J. Gray, under the style of T. J. Gray & Co. That inasmuch as complainant had furnished no advances since, the charge is made that the proceeds of grain sold by T. J. Gray & Co., the old firm, but bought with advancements before then made to Gray, forms the principal part of the assets of said new firm, on which they are doing business. This is assumed on the ground that neither of the members of the new firm, except Woodard, had any means, and it is said Woodard had furnished but little, if any, money. From this the charge is deduced that the new firm is carried on principally with money due, and properly belonging to complainant. This conclusion and charge is based on the facts we have given, and no other taken from the bill.

It is then charged, that Gray had said about the time of the formation of the new firm, he had enough grain on hand, bought with the money advanced by complainant, to pay the debt, and the bank had repeatedly urged him to sell and turn over the bills of lading, but he had failed to do so, insisting on holding it and waiting for a better price, though grain had advanced from twenty-five to forty per cent since its purchase; that he had also promised a statement of the amount on hand, but had failed to give it, and had even failed to turn over other securities as he had promised.

It is then alleged that the new firm has been

doing business since its formation, and is now using in its business the *money obtained from sale of grain* bought [with complainant's money; and further, they have on hand about —— bushels of grain which they admit was bought with the money complainant had furnished, but all the grain mentioned would not pay half the debt, notwithstanding the advance in the price.

We have thus fully summarized the charges in complainant's bill against the new firm of T. J. Gray & Co., from which it is seen that no equity whatever is raised against said firm, as a firm, in favor of complainant.

The sum of it all is, that T. J. Gray, as T. J. Gray & Co., had got advancements from the bank with an agreement to purchase grain and ship, turning over the bills of lading to the bank to cover the money advanced, had used the money, shipped the grain and sold it, had formed a new firm, and had used the proceeds of sales of grain thus purchased and sold, as capital stock in a new firm of T. J. Gray & Co., composed of T. J. Gray, R. S. Woodard, and his two sons. The assumption is that as the grain was purchased with money advanced by the bank to purchase the grain, that it can follow the proceeds of the grain into the new firm, and have the capital of that firm appropriated to the payment of complainant's debt. We need only to say, that the facts, if admitted, furnish no basis whatever to charge either the new firm or its capital or purchases with such capital in favor of complainant. The new firm owes the bank nothing, never did, nor could the fact that Gray had put

money into the new firm, that he ought morally to have paid to complainant, by any possibility raise any equity whatever in favor of complainant against the funds or property of the new firm, as a firm. This is too clear for argument or need of authority. Gray was and is the debtor of the bank, but the bank, by reason of the facts stated, had no lien or legal equity on the grain purchased, which it could enforce, much less against the proceeds of such grain, when sold, especially when employed as capital in a new business, in which other partners are concerned. But on looking into the facts of the case, so far as they go to the issues tendered by the bill, it is definitely denied that any capital came from the source indicated, on the contrary, it is answered, and the fact is that way, that the new firm obtained the capital, so far as it had any cash capital, by a loan made by the First National Bank of Fayetteville on a note for $3,000, discounted by the bank, the note procured to be discounted on the credit of Woodard, who was the cashier of said bank, and solvent, and who furnished, we take it, the endorsers. This note was still due and unpaid when the bill in this cause was filed, and constituted the largest item of indebtedness of the new firm.

The rights of complainant will be seen, by conceding that all the charges of facts in the bill are true, as if the case stood on demurrer: that is, that the new firm commenced business on money procured by Gray by sale of grain purchased by him, with money advanced on checks by complainant. Admit all this, and all the liability that legally results, is

that Gray, as Gray & Co., (old firm), owes the bank the ,amount of money obtained, and instead of paying out of proceeds purchased by him with such money, he has used the money otherwise, as capital for the business of Gray & Co., (new firm), in the purchase of grain.   This may be a breach of faith on the part of Gray, but no court could be asked to hold that thereby the new firm incurred any liability or responsibility for the debt of Gray.   This is so clear that it is evidently an oversight of the learned counsel, that the bill, so far as this feature of it is concerned, was not demurred to.   It certainly stated no case of liability of the new firm for complainant's debt.   But as we have said, the charge that the capital used by the new firm, was derived as is alleged, is not only denied, but is distinctly disproved.

The most that can be made out of the facts of the case, as found in the bill, is that Gray, the debtor of complainant, has an interest in the new firm, to the extent agreed on in the partnership articles, to-wit, one-third, and complainant was entitled as a creditor to attach, if proper grounds are stated, that interest, have the firm account taken, the amount due Gray ascertained and appropriated to the payment of their debt.   Instead of this, however, complainant has sought primarily, based on these facts, a decree for its debt, against Gray & Co., of the old firm, and also the new firm, and has obtained an attachment against the new firm, attaching all its effects and assets, and prays that these properties be sold, or a sufficiency, to pay the bank, and proceeds applied to the payment of the

debt stated in the bill, of Gray, as Gray & Co., old firm. This attachment and impounding of these assets has no foundation on which it could have been sustained had proper steps been taken by defendants to have it discharged. They have voluntarily submitted to it, however, replevied the property of the new firm, and so we need not further discuss it.

As an ancillary prayer to the primary one, complainant has asked that both old and new firms be wound up, and all the effects of either properly belonging to T. J. Gray be applied to the payment of their debt. An account between T. J. Gray and the new firm is specially prayed for. This has not been insisted by respondents, but if it had been, we would be at a loss to see on what grounds of fact, from any allegations of this bill, such an account could have been claimed. Gray was simply the debtor of complainant, and was partner in the new firm of Gray & Co., of which Woodard was a member. This certainly gave him no right to have the latter firm wound up without something more. A levy on the interest of one party in a partnership, either of an execution or an attachment levied on such interest, would be the basis on which such relief could be asked in order that the creditor might have the *interest* of his debtor ascertained and applied, he having a fixed lien on the same by process.

But we know of no principle on which a simple creditor at large, of a member of the firm, has such a right. The account, however, has been ordered by the chancellor taken, and is satisfactory to the respon-

dents. The chancellor has decreed on the same, and the Commission of Referees have reported in favor of an affirmance of the decree of the chancellor. The exceptions of complainant has raised the question of the correctness of this report, and the decree of the chancellor, and we proceed to dispose of the case on these aspects of it.

The main contention of the counsel of complainant is, that in taking this account, between Gray and Gray & Co., (new firm), that large quantities of grain of Gray & Co., (old firm), went into the hands or business of the new firm, with which they have not been charged.

We agree with the chancellor and Commission of Referees, that complainant has failed to make out its contention, by the weight of the proof. The main argument urged with great zeal is, that the books of the new firm show that it had shipped a large amount more grain than the same books showed had been purchased. But how this shows that Gray has furnished this grain, so as to make it a charge in his favor, or taking the partnership account is more than we are able to see. Until this is done it can make no difference to complainant whether they shipped more or less than their books showed they had bought. The want of correspondence in the account of purchases, and of shipments, could give complainant no rights whatever, on any grounds urged by counsel in the argument. It could only serve as a basis on which to ascertain the amount of business of the firm, when profit and loss was to be settled.

Bank v. Gray.

So with reference to sacks, argued to have been furnished by Gray to the new firm, we need but say, the proof fails to make any basis for an account, and besides both as to grain and sacks, there is not an allegation in the bill on which such an investigation could rest.    There is no charge that any such property of T. J. Gray was in the possession of the new firm, or ever had been, but only substantially as we have stated, that the proceeds of grain, that money arising from the sale of grain purchased by Gray & Co., (old firm), had been made the basis of the business, or used in the business of the new firm.    As we have said this is positively disproven, but if true, would only be so much capital of Gray furnished for the new business, and therefore an element that would enter into the account in that way.    The same would be the result if he had put the grain in the new firm which he had purchased with money borrowed from complainant.    No lien or equity under the facts would be fixed on such grain in favor of the bank, simply because of the fact it had loaned the money under the arrangement stated in the bill. ·

Without further discussion, it is only necessary to say the chancellor reached the proper result in his cause on this branch of the case—certainly as near it as can be reached from the proof, and the report of the Referees approving of that decree · will be affirmed.

·· As to the other matters presented in the bill, in connection with the First National Bank, the proper result is reached, and so with reference to the wheat

taken on the day of the levy of the attachment, but before any levy. Complainant has obtained all it is entitled to, in fact on every aspect of the case, and more than could be sustained, if the utmost liberality had not been extended in giving scope to the bill beyond what its whole theory, as well as facts would fairly justify.

As to the effort to reach agricultural implements, etc., and other properties, the proceeds of such as had been sold, we would but say that the facts as charged would give no superior equity in favor of complainant, even if proven. But on the assumption complainant has the right to appropriate the individual property of Gray, complainant fails to be entitled to more than it has got by the decrees before us, as it is beyond question that he was but an agent selling these properties on commission.

We have gone more at length into this case, out of regard to the zeal of counsel, than the allegations of the bill, and the facts proven applicable to these charges would otherwise demand. The result is that the report of the Referees is approved, and decree of the chancellor affirmed, with costs of this court to be paid by complainant.